1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA, )
 )
 Plaintiff, ) Case No. 2:11-cr-00312-MMD-PAL
 )
vs. ) **REPORT OF FINDINGS AND**
 ) **RECOMMENDATION**
ANIL MATHUR, )
 ) (Motion to Dismiss - Dkt. #48)
 Defendant. )
_____ )

Before the court is Defendant Anil Mathur's Motion to Dismiss based upon Overbreadth and Vagueness and Other Constitutional Principles (Dkt. #48).  The motion was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered the Motion, the government's Opposition (Dkt. #60), and Mathur's Reply (Dkt. #70).

**BACKGROUND**

The grand jury returned an Indictment (Dkt. #1) against Mathur on August 23, 2011, charging him with nine counts of paying illegal remunerations, in violation of 42 U.S.C. § 1320 a-7b(b)(2)(A) (the "Anti-Kickback Act").  The Indictment alleges Mathur offered kickbacks and bribes to a physician in exchange for referrals of Medicare patients and contains forfeiture allegations.  The first forfeiture allegation seeks to recover $6,000.00 in kickbacks or bribes allegedly paid by Mathur between July 30, 2010, and December 7, 2010.  The second forfeiture allegation seeks a monetary judgment in the amount of $14,347.68–the amount the government contends Medicare paid for services rendered after March 23, 2010, to Medicare patients referred by the physician receiving kickbacks or bribes.

/ / /

/ / /

**DISCUSSION**

Pursuant to Federal Rule of Criminal Procedure 12(b), "Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." In determining a motion to dismiss an indictment, "a court is limited to the face of the indictment and must accept the facts alleged in that indictment as true." *United States v. Ruiz-Castro*, 125 F. Supp. 2d 411, 413 (D. Haw. 2000) (citing *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir. 1954), *cert. denied*, 349 U.S. 922 (1955)). The indictment itself should be "(1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense." *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993) (citing *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982), *cert. denied*, 460 U.S. 1086 (1983)). The court's inquiry must end there. Arguments directed at the merits of the claims must be left for trial.

**I.     The Parties' Positions**

        **A.     Mathur's Motion (Dkt. #51)**

Mathur's Motion to Dismiss challenges the constitutionality of the indictment on First and Fifth Amendment grounds. First, he argues that his relationship with the physician to whom the government alleges illegal remunerations were paid "implicates significant commercial speech issues." The government alleges that Mathur provided cash payments to the physician in exchange for patient referrals. Mathur claims that the objective evidence in this case demonstrates that he did not request that the physician send him patients. Rather, Mathur claims that he only sought favorable recommendations from a well-connected physician who could speak positively about Mathur to other professionals and recommend the services of Mathur's business, United Medical Supplies ("UMS").

Mathur contends that all of his statements to the physician involve promoting UMS for the purpose of acquiring more business based on the physician's favorable recommendations. Mathur's statements are merely solicitation of business which is commercial speech, protected by the First Amendment. He reasons that allowing the government to prosecute him for soliciting business would punish him for exercising his First Amendment rights and chill significant amounts of commercial speech. Mathur maintains that any remuneration he is alleged to have given the physician was not for the purpose of inducing patient referrals, but for the physician to promote and recommend the services

1   of UMS to others.  Mathur argues the government is attempting to criminalize a business relationship in
2   which a sophisticated physician would make favorable recommendations to other professionals about
3   UMS' available respiratory services and supplies that the government acknowledges were legitimately
4   provided to patients.  Thus, the Indictment must be dismissed because the government is attempting to
5   criminalize conduct and commercial speech protected by the First Amendment.  If the court is unwilling
6   to dismiss the Indictment, Mathur contends the court must convene an evidentiary hearing and require
7   the government to present objective evidence demonstrating that the speech and expressions it seeks to
8   criminalize are not protected by the First Amendment.

9       Second, Mathur argues that the Anti-Kickback Act is unconstitutionally applied to his conduct
10  and is facially overbroad.  He maintains his only motivation was to induce the physician to speak
11  favorably about UMS to others.  He claims the government's theory of this case is "ill-conceived,
12  devoid of factual support and requires criminalization of [c]onstitutionally protected activity."  The
13  objective evidence in this case undermines the government's theory that Mathur paid remunerations to
14  the physician with the specific intent to induce the physician to send Mathur patients covered by a
15  federal heath care program.  Mathur claims it was factually impossible to induce the physician to make
16  referrals because the physician was acting in an undercover capacity.  It was also legally impossible to
17  induce the physician to make referrals because the physician certified under penalty of perjury to the
18  medical necessity of any referrals made.  Mathur claims that asking another person to promote one's
19  business to others and offering remuneration for doing so cannot be a crime under the Anti-Kickback
20  Act; otherwise, "the FBI would be storming the marketing department of every pharmaceutical and
21  orthopaedic supply company."  Mathur argues that the Anti-Kickback Act is unconstitutional as applied
22  to Mathur's activities, expression, and speech.

23      Next, Mathur argues the Anti-Kickback Act is facially overbroad.  He acknowledges the
24  government has a legitimate interest in deterring and preventing health care fraud, especially involving
25  Medicare and Medicaid.  However, he maintains that when Congress enacted the Patient Protection and
26  Affordable Care Act ("PPACA") in 2010, eliminating the Anti-Kickback Act's prior specific intent
27  *mens rea* requirement, it "provided federal prosecutors exclusive discretion to criminalize otherwise
28  [c]onstitutionally protected activity."  Mathur claims that it is virtually impossible to know what the

3

1   Anti-Kickback Act covers and that the statute, as amended by the PPACA, is "of alarming breadth and

2   allows the government to cast an exceptionally wide net in a substantial number of its applications."

3   The breadth of the PPACA amendments to the Anti-Kickback Act, which eliminated the specific intent

4   requirement, invites arbitrary and selective enforcement.  The court should find that the Anti-Kickback

5   Act is unconstitutional because it is overly broad in a substantial number of its applications.

6           Mathur also argues that the statute is unconstitutionally vague because it fails to give a person of

7   ordinary intelligence fair notice that his contemplated conduct is forbidden by statute.  He claims the

8   Anti-Kickback Act is vague on its face and incomprehensible to a person of ordinary intelligence.

9           Finally, Mathur argues the Indictment should be dismissed because government counsel has not

10  identified whether Mathur is being prosecuted under pre-PPACA version of the Anti-Kickback Act or

11  the post-PPACA version.  He claims his due process rights are violated because the Indictment is silent

12  on this point, and government counsel has not provided a helpful response to defense counsel's

13  inquiries.  Mathur points out that paragraph four of the Indictment defines remuneration as "anything of

14  value" and suggests the government can convict "if any one purpose of conferring remuneration is to

15  induce that person to refer an individual for the furnishing of an item or service for which payment may

16  be made under a Federal health care program, such as Medicare."  The "one purpose" language is not

17  contained in the Anti-Kickback Act.  Although both the Third and Ninth Circuits have held that it is a

18  violation of the Anti-Kickback Act if any one purpose of remuneration is to induce or reward referrals

19  of federal health care program business, Mathur claims that the Supreme Court's decision in *United*

20  *States v. Gaudin*, 515 U.S. 506 (1995), effectively overruled the "one purpose" rule.

21          He contends the court should conduct an evidentiary hearing to allow him to examine

22  government witnesses about whether the physician and Mathur were engaged in commercially-

23  protected activities.  Mathur argues this is a legal question that should be resolved pre-trial, and one that

24  "will have significant and far-reaching consequences for the health care industry (including the

25  hospitality industry which depends upon executives and physicians frequenting their establishments and

26  spending money)."

27  / / /

28  / / /

4

**B.**  **The Government's Consolidated Response (Dkt. #60)**

The government filed a consolidated Response to this Motion and Mathur's other Motion to Dismiss the Indictment (Dkt. #51).  The Response argues that Mathur's extensive factual arguments about what the evidence in this case shows and the inferences that may be drawn from it are not appropriately considered by the court in a motion to dismiss.  In deciding a motion to dismiss the Indictment, the court is limited to the facts alleged in the Indictment, which must be accepted as true.  Here, the Indictment alleges that Mathur paid bribes to a physician in exchange for patient referrals in violation of the Anti-Kickback Act, and the jury must determine whether Mathur's conduct and payments to the physician were bribes or a lawful business practice.  The Indictment alleges that Mathur made cash payments to the physician as a quid pro quo for patient referrals, which, according to the government, is precisely the conduct criminalized by the Anti-Kickback Act.

With respect to Mathur's First Amendment challenge to the Indictment, the government contends the Anti-Kickback Act prohibits remunerations, not speech.  Courts have uniformly rejected the notion that bribery is protected speech.  Mathur's Motion cites no case supporting his proposition the Anti-Kickback Act has been successfully challenged on First Amendment grounds.  In *Gibony v. Empire Storage & Ice Co.,* the Supreme Court held that the First Amendment does not immunize "speech or writing used as an integral part of conduct in violation of a valid criminal statute."  336 U.S. 490, 498 (1949).  Although political speech enjoys considerably greater First Amendment protection, bribery is not protected political speech.  The government relies on a line of cases holding that bribes and threats are not protected merely because they are spoken or written.

The government acknowledges that solicitation of lawful business is a recognized form of commercial speech protected by the First Amendment.  The Indictment alleges Mathur made payments ranging from $1,500 to $5,400 in exchange for patient referrals.  The Anti-Kickback Act criminalizes corrupt payments in exchange for referrals, not statements related to those payments.  The government argues that Mathur's fact-based arguments that he was not actually offering or giving illegal remuneration provides no basis to dismiss the Indictment.  Rather, if his theory is accepted by the jury, Mathur has committed no crime, and the constitutional issue he raises will be moot.

/ / /

1    The government also argues that the Anti-Kickback Act is not unconstitutionally vague.

2    Multiple courts of appeal, including the Ninth Circuit, and district courts have rejected Mathur's

3    arguments that the Anti-Kickback Act does not provide fair notice that certain conduct is prohibited.  In

4    *Hanlester Network v. Shalala*, 51 F.3d 1390 (9th Cir. 1995), the Ninth Circuit applied controlling

5    Supreme Court precedent and held that the Anti-Kickback Act gave fair warning of what is prohibited

6    and was not constitutionally vague.  The First and Eleventh Circuits have also held that the Anti-

7    Kickback Act is not unconstitutionally vague as have district court decisions in the Northern District of

8    Ohio and Middle District of Florida.

9    The government also acknowledges that the Anti-Kickback Act is a broad statute that captures a

10   wide array of illegal activity.  However, the government maintains that a number of federal statutes

11   encompass a wide array of conduct and confer significant discretion upon prosecutors.  Specifically, the

12   mail or wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the conspiracy statute, 18 U.S.C. § 371, and

13   the RICO statute, 18 U.S.C. §§ 1961-1968, are all broadly-written statutes.  Congress further limited the

14   scope of the Anti-Kickback Act with a series of statutory and regulatory exceptions known as "safe

15   harbors" which immunize certain practices from criminal prosecution.  Thus, the government maintains

16   Mathur had ample notice of the scope of the Anti-Kickback Act.

17   The government next addresses the Anti-Kickback Act's *scienter* requirement before and after

18   the enactment of the PPACA.  In 2010, before the enactment of the PPACA, there was a split of

19   authority among the courts of appeal on the Anti-Kickback Act's *scienter* requirement involving the

20   proper construction of the phrase "knowingly and willfully" in the statute.  The government argues that

21   Congress added subsection (h) to the Anti-Kickback Act to resolve that split and clarify the proper

22   construction of the phrase "knowingly and willfully."  The government maintains the majority position

23   was first announced in the First Circuit's decision in *United States v. Baystate Ambulance & Hospital*

24   *Rental Service, Inc.*, 874 F.2d 20, 33 (1st Cir. 1989).  The First Circuit held that the phrase "knowingly"

25   simply meant to do something voluntarily, not deliberately or by mistake or accident.  The decision

26   defined "willfully," for purposes of the Anti-Kickback Act, to mean doing something purposely, with

27   the intent to violate the law, or doing something purposefully that the law forbids.  The Fifth, Eighth,

28   / / /

1    Tenth and Eleventh Circuits have also concluded that the government is not required to prove a

2    defendant had knowledge of, and intended to violate, the Anti-Kickback Act.

3          The Ninth Circuit, however, construed the phrase "knowingly and willfully" to require the

4    government to prove that a defendant: (a) knew the Anti-Kickback Act prohibited offering or paying

5    remuneration to induce referrals; and (b) engaged in prohibited conduct with the specific intent to

6    disobey the law. *Hanlester*, 51 F.3d at 1400.  According to the government, the Ninth Circuit was the

7    only court to conclude that the phrase "knowingly and willfully" in the Anti-Kickback Act required

8    proof of a violation of a known legal duty.

9          With the PPACA's addition of subsection (h) to the Anti-Kickback Act in 2010, Congress

10   resolved the circuit split on the *scienter* requirement by clarifying that a defendant need not have

11   knowledge of or specific intent to violate the Anti-Kickback Act.  Subsection (h) did not remove the

12   *scienter* requirement altogether.  Rather, the government maintains Congress implicitly adopted the

13   majority statutory construction of "knowingly and willfully" first articulated by the First Circuit in

14   *Baystate Ambulance*.  The government asserts that the legislative history of the PPACA and its

15   predecessor bills establish Congress' intent that the PPACA resolves the split of authority among the

16   circuits and clarifies that the government need not show a defendant's actual knowledge of the Anti-

17   Kickback Act or a specific intent to violate it in order to prove a violation of the statute.

18         **C.      Mathur's Reply (Dkt. #70)**

19         The Reply reiterates arguments that the Anti-Kickback Act has no apparent boundaries and

20   gives prosecutors virtually unfettered discretion to prosecute a myriad of activities.  Mathur again

21   claims that his prosecution is highly unusual and that the local United States Attorney's Office appears

22   to have deviated from Department of Justice treatment in other similar cases.  The prosecution also

23   appears, to counsel for Mathur, to have deviated from the government's treatment of other similarly

24   situated individuals who have engaged in far worse conduct than that alleged against Mathur.  He cites

25   a *New York Times* article to support his understanding that the Obama Administration has subjected

26   companies to civil penalties rather than criminal prosecution.  Mathur believes he is being treated more

27   harshly than others.  He cites, as an example, a deferred prosecution agreement the Department of

28   Justice entered into with Smith & Nephew executives who agreed to pay $16.8 million dollars to avoid

1   prosecution.  He contends that this example demonstrates that the Anti-Kickback Act can be applied in

2   a highly discretionary manner.  He cites other local examples of health care providers who were

3   permitted to settle health care fraud cases with no criminal charges filed.

4         He also argues that the rule of lenity requires that the Anti-Kickback Act be applied narrowly.

5   He relies on a recent Ninth Circuit decision in *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012), in

6   which the Ninth Circuit refused to apply the Computer Fraud and Abuse Act to the defendant's

7   conduct.  In *Nosal,* the Ninth Circuit stated that statutes should be constructed narrowly to avoid

8   unintentionally turning ordinary citizens into criminals.  In this case, Mathur claims that the government

9   seeks to punish him for requesting favorable recommendations from a physician that, unbeknownst to

10  him, was a confidential informant for the government.  If the government can prosecute Mathur under

11  the Anti-Kickback Act, "then a health care executive should be prosecuted for merely purchasing an

12  expensive dinner for a doctor in the hopes that the doctor would speak favorably to others about the

13  executive's business."  According to Mathur, even purchasing a hamburger for a doctor hoping to get a

14  medical referral would, under the government's interpretation of the Anti-Kickback Act, be a federal

15  felony.  For these reasons, the court should dismiss the Indictment on overbreadth and vagueness

16  grounds.

17  **II.**  **Applicable Law and Analysis**

18      **A.**  **The Anti-Kickback Act**

19        Mathur asserts various constitutional challenges to the Anti-Kickback Act, 42 U.S.C. § 1320a-

20  7b(b)(2)(A), the statute under which he is being prosecuted.  It provides, in relevant part:

21          (2)  Whoever knowingly and willfully offers or pays any remuneration

22               (including any kickback, bribe, or rebate) directly or indirectly,
    overtly or covertly, in cash or in kind to any person to induce such

23               person–

24               (A)  to refer an individual to a person for the furnishing or
    arranging for the furnishing of any item or service for which

25                    payment may be made in whole or in part under a Federal
    health care program . . .

26          shall be guilty of a felony and upon conviction thereof, shall be fined no
    more than $25,000 or imprisoned for not more than five years, or both.

27

28  *Id.*

1   Congress amended the Anti-Kickback Act in 1977 to strengthen the government's ability to

2   prosecute fraud and abuse in the Medicare and Medicaid system.  *See* H.R. Rep. No. 95-393, pt. 2, at 44

3   (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.  The legislative history notes the disturbing degree

4   of fraudulent and abusive practices associated with providing health services financed by Medicare and

5   Medicaid programs.  The 1977 amendments added language prohibiting: (a) the solicitation or receipt

6   of "any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in

7   cash or in kind," in return for referrals; and (b) the offer or payment of such remuneration to "induce"

8   referrals.  *Hanlester*, 51 F.3d at 1396 (citing Pub.L. No. 95-142, 91 Stat. 1175, 1182 (1977)).  The 1977

9   amendments also upgraded a violation of the Anti-Kickback Act from a misdemeanor to a felony.  *Id*.

10   Mathur claims the Anti-Kickback Act is unconstitutional under the First Amendment because it

11   is facially overbroad and as applied to the conduct alleged in this case.  He also argues that the statute is

12   void for vagueness because it is incomprehensible to a person of ordinary intelligence.  His vagueness

13   challenge is based on the Due Process Clause of the Fifth Amendment.

14   **B.      Mathur's Request for an Evidentiary Hearing**

15   Mathur's Motion to Dismiss contains extensive factual arguments about the government's

16   evidence as revealed in discovery produced to Mathur.  It also advances Mathur's theory of what the

17   "objective evidence" shows–specifically, that Mathur engaged in innocent non-criminal conduct

18   intended to promote his business.  It relates the history of Mathur's personal and professional

19   relationship with the physician, who is the government's primary witness, and their respective families.

20   The Motion details at some length the content of tape recordings the physician made with Mathur that

21   the government also produced in discovery.

22   As an initial matter, the government is correct that, for purposes of deciding this Motion to

23   Dismiss, the court must accept the facts pled in the Indictment as true.  This has been the law in the

24   Ninth Circuit for more than fifty years.  *See Winslow v. United States*, 216 F.2d 912, 913 (9th Cir.

25   1954), *cert. denied* 349 U.S. 922 (1955).  Mathur is not entitled to a pre-trial evidentiary hearing to

26   obtain a preview of the government's evidence and an opportunity to cross-examine its witnesses.  In

27   deciding a motion to dismiss, the court may not consider whether the government can *prove* its case,

28   only whether accepting the facts as alleged in the Indictment as true, a crime has been alleged.

Applying this standard, the court finds that the Indictment in this case states a violation of the Anti-Kickback Act when read as a whole to include the facts necessarily implied from the Indictment and construed according to common sense.  *See United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993).  The Indictment adequately alleges the elements of the offense and fairly informs Mathur of the charges.

The Indictment alleges that Mathur knowingly and willfully offered and paid remunerations, including a kick-back or bribe, directly or indirectly, overtly or covertly, in cash or in kind to refer individuals, including Medicare patients, to UMS for the furnishing of services for which payment may be made in whole or in part under a federal health care program.  The Indictment alleges specific dollar amounts and the dates on which the remunerations were paid in return for Medicaid referrals.  It mirrors the statutory elements of the offense in sufficient detail to allow Mathur to prepare his defense. Whether any remuneration Mathur paid to the physician was for the purpose of inducing a referral for a Medicare or Medicaid patient in violation of the Anti-Kickback Act as the government alleges, or merely a legitimate and accepted business practice as Mathur contends, is for the jury to determine. The Indictment alleges that Mathur made nine separate cash payments ranging in amounts from $1,500.00 to over $5,000.00, and totaling $26,000.00, to induce the physician to refer Medicaid patients to him.  Whether the government can prove these payments were made is for the jury to decide.  The Indictment alleges a crime, and Mathur's factual arguments about the government's evidence and the reasonable inferences to be drawn from that evidence are not for the court to decide in a motion to dismiss.  Mathur is not entitled to an evidentiary hearing to explore whether the government can prove its case.

### C.     **Mathur's First Amendment Facial Overbreadth Challenge**

Mathur seeks to dismiss the Indictment arguing that, on its face, the Anti-Kickback Act violates the First Amendment because it criminalizes protected commercial speech.  It is well-established that a person to whom a statute may be constitutionally applied cannot challenge that statute because it could conceivably be applied unconstitutionally to others in situations not before the court.  *New York v. Ferber*, 458 U.S. 747, 767 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973), *superceded by statute on other grounds as recognized in Bauers v. Cornett,* 865 F.2d 1517 (8th Cir. 1989); *United*

1   *States v. Raines*, 362 U.S. 17, 21 (1960); *Carmichael v. Southern Coal & Coke, Co.,* 301 U.S. 495, 515

2   (1937).  This rule is based on two cardinal principles of constitutional law.  *Ferber*, 458 U.S. at 768.

3   First, constitutional rights are personal in nature.  *Id.*  Second, Article III of the Constitution limits the

4   jurisdiction of the federal courts to actual cases and controversies.  *Id*.  This means that the court must

5   not: (a) anticipate a question of constitutional law in advance of the necessity of deciding it; or (b)

6   formulate a rule of constitutional law broader than required by the precise facts to which the rule will be

7   applied.  *Id*. at n.20.

8           However, where First Amendment rights are implicated, the Supreme Court has carved out an

9   exception to this rule and allowed constitutional overbreadth challenges even when the challenger's

10  conduct may be legitimately regulated under the statute.  The First Amendment overbreadth doctrine is

11  based on the weighty counterveiling policy that constitutionally-protected speech could be chilled by

12  the fear of criminal sanctions.  *Id.*  For this reason, the Supreme Court has allowed challenges to overly

13  broad statutes even though the conduct of the person challenging the statute "is clearly unprotected and

14  could be proscribed by a law drawn with the requisite specificity." *Id.* (citing *Dombrowski v. Pfister,*

15  380 U.S. 479, 486 (1965); *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940); *United States v. Raines,*

16  362 U.S. at 22-23; *Gooding v. Wilson*, 405 U.S. 518, 521 (1972)).  However, the Supreme Court has

17  made clear that the First Amendment overbreadth doctrine is "strong medicine" only to be used as a

18  "last resort" where a statute implicates a "substantial" amount of protected expression.  *Ferber,* 458

19  U.S. at 769 (citing *Broadrick,* 413 U.S. at 613, and recognizing the wide-reaching effects of striking

20  down a statute on its face at the request of a party whose conduct may be punished despite the First

21  Amendment).  The Supreme Court has held that "particularly where conduct and not merely speech is

22  involved, we believe that the overbreadth of a statute must not only be real, but substantial as well,

23  judged in relation to the statute's plainly legitimate sweep." *Id.* at 770.

24          In deciding whether a federal statute is overbroad, the court must construe the statute to avoid

25  constitutional problems if the statute is subject to a limiting construction.  *Id.* at 769 (citing *Crowell v.*

26  *Benson*, 285 U.S. 22, 62 (1932)).  Additionally, even if a federal statute is impermissively overbroad

27  and not subject to a narrowing construction, the law should not be stricken as invalid on its face if the

28  invalid portion is severable from the remainder of the statute. *Id.* (citing *United States v. Thirty-Seven*

1    *Photographs*, 402 U.S. 363 (1971)).  Rather, if the overbroad law is severable, only the unconstitutional

2    portion should be declared invalid.  *Id.*  The Supreme Court has been reluctant to strike down a statute

3    on its face where there were a substantial number of situations to which it might be validly applied.

4    *Parker v. Levy,* 417 U.S. 733, 760 (1974).  Thus, even if there are marginal applications in which a

5    statute would infringe on speech protected by the First Amendment, the court should not declare the

6    statute facially invalid if it also covers a range of easily identifiable conduct that may be constitutionally

7    proscribed.  *Id.*  In fact, the Supreme Court's general practice when confronted with a facial overbreadth

8    challenge to a criminal statute sought to be applied against protected conduct is to reverse a particular

9    conviction, rather than to invalidate the law in its entirety.  *Ferber,* 458 U.S. at 773 (citing *Cantwell v.*

10    *Connecticut*, 310 U.S. 296 (1940); *Edwards v. South Carolina*, 372 U.S. 229 (1973)).

11          Generally, the First Amendment prohibits the government from restricting expression because

12    of its message, ideas, subject matter, or content.  *United States v. Alvarez*, 132 S.Ct. 2537, 2543 (2012)

13    (citing *Ashcraft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).  Content-based

14    restrictions on speech are presumed invalid, and the government bears the burden of showing they are

15    constitutional.  *Id.* at 2544.  However, the government may restrict some speech without violating the

16    First Amendment.  *Id.* at 2547 (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*

17    *Council, Inc.*, 425 U.S. 748, 771 (1976)).  From 1791 to the present, the Supreme Court has upheld

18    content-based restrictions on speech based on an ad hoc balancing of relative social costs and benefits

19    in a limited number of situations.  *Alvarez*, 132 S.Ct. at 2537.  Content-based restrictions on speech

20    have been permitted for a few "historic and traditional categories of expression long familiar to the

21    bar," including: incitement to imminent lawless actions; obscenity; defamation; so-called "fighting

22    words;" true threats; and speech presenting some grave and imminent threat the government has the

23    power to prevent.  *Id*. at 2539 (internal punctuation and citation omitted).

24          The same overbreadth scrutiny has not been applied to conduct-related regulation implicating

25    the First Amendment.  *Ferber*, 458 U.S. at 766.  Additionally, speech promoting or encouraging illegal

26    activity, such as illegal drug use, may be regulated or banned entirely.  *Village of Hoffman Estates v.*

27    *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982) (citing *Central Hudson Gas & Electric Corp.*

28    *v. Public Service Comm'n,* 447 U.S. 557, 563-64 (1980)).

                                                    12

1    Mathur argues the Anti-Kickback Act infringes protected commercial speech, specifically

2    speech related to solicitation and marketing of his business.  It is undisputed that commercial speech

3    enjoys some protection under the First Amendment.  *See, e.g., Virginia State Board of Pharmacy*, 425

4    U.S. at 771.  The Supreme Court defines commercial speech as "expression related solely to the

5    economic interests of the speaker and its audience."  *Central Hudson Gas,* 447 U.S. at 561.  Mathur

6    cites *Bolger v. Young's Drug Products Corporation* for the proposition that, in considering whether

7    speech is commercial, the court should make "the 'commonsense' distinction between speech

8    proposing a commercial transaction, which occurs in an area traditionally subject to government

9    regulation, and other varieties of speech."  463 U.S. 60, 64 (1983).  Applying *Bolger*, he argues that if

10   the facts present a close question, speech should be characterized as commercial speech if it is an

11   advertisement, refers to a particular product, and the speaker has an economic motivation for engaging

12   in the speech.  Mathur  maintains that, where these combination of characteristics exist, *Bolger* provides

13   strong support for the conclusion that the speech in question is commercial speech, and therefore

14   protected by the First Amendment.

15   Mathur also relies on the Supreme Court's decision in *Edenfield v. Fane*, 507 U.S. 761 (1993).

16   There, the Supreme Court held that a certified public accountant's personal solicitation of potential

17   clients, which communicated no more than truthful, non-deceptive information and proposed lawful

18   commercial transactions, was protected by the First Amendment as commercial expression.  Mathur

19   claims that all he did here was develop a friendship and business relationship with the physician, hoping

20   the physician would make favorable recommendations and promote UMS to other health care

21   professionals who could, in turn, refer business to UMS.  This, he argues, is protected commercial

22   speech.  The government alleges Mathur made cash payments to induce referrals.

23   Speech and writing "used as an integral part of conduct in violation of the valid criminal statute"

24   is not protected by the First Amendment.  *Gibony v. Empire Storage & Ice Co.,* 336 U.S. 490, 498.

25   "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct

26   illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language,

27   either spoken, written or printed."  *Id.* at 502 (citing *Fox v. Washington*, 236 U.S. 273, 277 (1915);

28   *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)).  Proscribing bribery does not infringe on any

13

1   First Amendment rights because it neither chills, nor is intended to chill, constitutionally-protected

2   activities. *United States v. Dischner*, 974 F.2d 1502, 1511-12 (1992), *overruled on other grounds by*

3   *United States v. Morales,* 108 F.3d 1031, 1035 (9th Cir. 1997).  Laws which focus on criminal conduct

4   such as perjury, tax or administrative fraud, or impersonating an officer are not protected under the First

5   Amendment even though they can be violated by means of speech.  *United States v. Alvarez*, 617 F.3d

6   1198, 1213 (9th Cir. 2010).

7       Solicitation is protected expression under the First Amendment.  *See, e.g., Comite de*

8   *Jornaleros*, 657 F.3d 936, 945 (9th Cir. 2011).  However, the Anti-Kickback Act does not regulate

9   speech protected by the First Amendment.  *See Hanlester,* 51 F.3d at 1398.  Rather, it regulates the

10  *conduct* of paying or offering to pay remuneration in return for Medicare or Medicaid referrals.  *Id.*

11  (stating "[t]he statute regulates only economic conduct").  The court finds that the Anti-Kickback Act is

12  not facially overbroad.  It is not a content-based regulation of speech.  The Supreme Court has

13  recognized a law may be held invalid as overbroad if "a substantial number of its applications are

14  unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*,

15  130 S.Ct. 1577, 1587 (2010) (citing *Washington State Grange v. Washington State Republican Party*,

16  552 U.S. 442, 449 n.6 (2008)).

17      The Supreme Court has held that the first step in overbreadth analysis is to construe the

18  challenged statute because "it is impossible to determine whether a statute reaches too far without first

19  knowing what the statute covers."  *United States v. Williams*, 553 U.S. 285, 293 (2008).  Here, the Anti-

20  Kickback Act prohibits a person from knowingly and willfully offering or paying any remuneration

21  (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to

22  induce a person to refer an individual to a person for the furnishing or arranging of the furnishing for

23  any item or service for which payment may be made in whole or in part under a federal health care

24  program.  The 1977 amendments to the Anti-Kickback Act underscore Congress's concern with

25  escalating fraud and abuse in the Medicare and Medicaid systems and attempt to strengthen the

26  government's ability to prosecute such fraud and abuse.  *See Hanlester*, 51 F.3d at 1396.  "Congress

27  introduced the broad term 'remuneration' in the 1977 amendment of the statute to clarify the types of

28  financial arrangements and conduct to be classified as illegal under Medicare and Medicaid."  *Id.* at

14

1398.  The phrase "any remuneration" was intended to broaden the law which had earlier only referred

to kickbacks, bribes, and rebates.  *Id*.  The Ninth Circuit has held that for purposes of the Anti-

Kickback Act, the term "induce" means "an intent to exercise influence over the reason or judgment of

another in an effort to cause the referral of program-related business."  *Id*.

Additionally, in 1987, Congress responded to the concerns of health care providers regarding the

Anti-Kickback Act's prohibition of certain types of beneficial business relationships by authorizing the

Office of Inspector General of the U.S. Department of Health & Human Services to promulgate

regulations designating specific "safe harbors" for various payment and business practices that could

potentially implicate Anti-Kickback Act.  These safe harbors, codified at 42 C.F.R. § 1001.952, specify

that certain relationships and conduct, although technically falling within the purview of the statute,

will not be prosecuted as criminal offenses under the Anti-Kickback Act.  The court concludes that with

these statutory definitions, judicial constructions, and regulatory safe harbors, a substantial number of

the Anti-Kickback Act's applications are not unconstitutional on First Amendment grounds, judged in

relation to the statute's plainly legitimate goal of combating health care fraud.

### D. Mathur's First Amendment as Applied Challenge

Mathur concedes the government has a legitimate interest in deterring and preventing health

care fraud, especially in relation to Medicare and Medicaid.  However, he claims that the "objective

evidence" and reasonable inferences drawn from it establish that he was engaged in a personal and

professional business relationship to promote his business, which is not a criminal offense.  He claims

that the Anti-Kickback Act is being unconstitutionally applied to his First Amendment protected

commercial speech.

The court has found that the Anti-Kickback Act is not facially overbroad under the First

Amendment.  Mathur's hypothetical questions about the scope of the Anti-Kickback Act have not

persuaded the court that a substantial number of the Anti-Kickback Act's applications are

unconstitutional, judged in relation to the statute's plainly legitimate sweep.  The "last resort" of the

"strong medicine" of declaring the Anti-Kickback Act facially overbroad and unconstitutional under the

First Amendment is not warranted based on the arguments presented in this case.  The Anti-Kickback

Act regulates conduct, not merely speech.  Even if there are marginal applications in which the Anti-

1    Kickback Act would infringe the First Amendment, the court will not declare the statute facially invalid

2    if it also covers a range of easily identifiable conduct that may be constitutionally proscribed.  There is

3    no question that paying or offering to pay bribes or rewards for Medicare referrals may be

4    constitutionally proscribed.  Whether that is what Mathur did is for the jury to determine.  The court

5    must therefore apply the two cardinal principles of constitutional law and not anticipate a question of

6    constitutional law in advance of the necessity of deciding it, or attempt to formulate a rule of

7    constitutional law broader than required by the precise facts to which the rule will be applied.  *See*

8    *Ferber*, 458 U.S. at 767.  The facts will be determined by the jury after evidence is presented at trial.

9              **E.      The Rule of Lenity**

10           The rule of lenity is a long-standing principle that courts must construe ambiguous criminal

11   statutes narrowly to avoid "making criminal law in Congress's stead."  *United States v. Santos*, 553

12   U.S. 507, 517 (2008), *superceded by statute on other grounds as stated in United States v. Elder*, 682

13   F.3d 1065, 1072 n.3 (8th Cir. 2012).  Mathur's Reply argues the court should follow the Ninth Circuit's

14   *Nosal* rule of lenity analysis and dismiss the Indictment.  In *United States v. Nosal*, 676 F.3d 854 (9th

15   Cir. 2012), the Ninth Circuit applied the rule of lenity, holding that the phrase "exceeds authorized

16   access" in the Computer Fraud and Abuse Act ("CFAA") does not extend to violations of an

17   employer's computer use restrictions.  The Ninth Circuit departed from decisions of the Fifth, Seventh,

18   and Eleventh Circuits that interpreted the CFAA broadly to cover violations of corporate computer use

19   restrictions or violations of a duty of loyalty.  The Ninth Circuit found that these decisions looked only

20   to the culpable behavior of the defendants before them and failed to consider the effect on millions of

21   ordinary citizens caused by the statute's definition of the phrase "exceeds authorized access."  The

22   Ninth Circuit found that the Fifth, Seventh, and Eleventh Circuits failed to apply the rule of lenity to

23   construe an ambiguous criminal statute narrowly.

24           The CFAA defines the phrase "exceeds authorized access" as "to access a computer with

25   authorization and to use such access to obtain or alter information in the computer that the accesser is

26   not entitled to obtain or alter."  18 U.S.C. § 1030(e)(6).  The Ninth Circuit acknowledged that the

27   phrase "exceeds authorized use" could reasonably be interpreted to prohibit unauthorized use from

28   outside hackers, *i.e,* individuals with no authorized access at all, as well as inside hackers, *i.e.*,

1   individuals who have authorized access to a computer, but who access unauthorized information and

2   files.  Nosal was an employee who left his company and convinced some of his former colleagues still

3   employed for the company to help him start a competing business.  The employees used their log-in

4   credentials to download source lists, names, and contact information from a confidential database on

5   the company's computer and transferred that information to Nosal.  The employees were authorized to

6   access the database, but the company had a policy forbidding them to disclose confidential information.

7   The government charged Nosal with CFAA violations.  The trial court granted Nosal's motion to

8   dismiss, and the Ninth Circuit affirmed.

9          The Ninth Circuit reasoned that the government's interpretation, which would apply the statute

10   to individuals who had authorized access but used the computer for unauthorized purposes (to

11   download and transfer confidential source lists and names and contact information), would expand the

12   scope of the CFAA "far beyond computer hacking to criminalize any unauthorized use of information

13   obtained from a computer."  *Id*. at 859.  Because this "would make criminals of large groups of people

14   who would have little reason to suspect they are committing a federal crime" the Ninth Circuit "was

15   properly skeptical" about whether Congress intended "to criminalize conduct beyond that which is

16   inherently wrongful, such as breaking into a computer."  *Id.*  Relying on *United States v. Kozminski*, the

17   Ninth Circuit found that adopting the government's broad interpretation of the CFAA to apply to

18   authorized users who exceed the scope of their authorization would delegate to prosecutors and juries

19   the inherently legislative task of determining what types of activity are so morally reprehensible that

20   they should be punished as crimes.  *Id.* at 862 (internal quotations and citations omitted).  Giving that

21   much power to a prosecutor invites discriminatory and arbitrary enforcement.  *Id.*

22          The Anti-Kickback Act does not suffer from the same infirmities the Ninth Circuit found

23   objectionable in *Nosal*.  For purposes of this Report of Findings and Recommendation, the court need

24   not decide the outer markers of the conduct which may be constitutionally proscribed by the Anti-

25   Kickback Act.  In this case, the government alleges that Mathur paid over $26,000.00 in cash in nine

26   different transactions, ranging in amounts between $1,500.00 and a little over $5,000.00, to induce the

27   physician to make Medicare referrals to Mathur's business.  The Indictment does not involve a health

28   care executive purchasing a hamburger or an expensive dinner for a doctor in the hopes that the doctor

17

1    would speak favorably to others about the executive's business.  The Anti-Kickback Act is not

2    ambiguous about whether bribes, kickbacks, or rebates may be offered or paid to induce referrals of

3    Medicare business.  The court concludes that the rule of lenity does not bar this prosecution.

4         **F.**    **Mathur's Void for Vagueness Challenge**

5         The Due Process Clause of the Fifth Amendment requires that a criminal law provide the kind

6    of notice that will enable ordinary people to understand what the law prohibits.  *City of Chicago v.*

7    *Morales*, 527 U.S. 41, 56 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)).  The Due

8    Process Clause of the Fifth Amendment is violated if "a statute is so vague about what is prohibited that

9    it authorizes or encourages arbitrary and discriminatory enforcement.  *Id*.  Or, as the Supreme Court

10   stated in *United States v. Williams*, "A conviction fails to comport with due process if the statute under

11   which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or

12   is so standardless that it authorizes or encourages seriously discriminatory enforcement."  553 U.S. 285,

13   304 (2008).

14        Mathur claims that the Anti-Kickback Act is so broad that it is incomprehensible to a person of

15   ordinary intelligence and too vague to provide him with constitutionally fair notice that his alleged

16   conduct is a criminal act.  He also argues the statute is so broad that it permits selective or

17   discriminatory enforcement.  Mathur appears to argue that the statute is both unconstitutionally vague

18   on its face and as applied to the facts alleged in the Indictment.  Mathur does not contend bribery or

19   kickbacks may not be constitutionally proscribed.  Rather, he argues that this is not what he did.  As the

20   court has now stated several times, that is what the jury must decide.

21        It is a well-established principle of constitutional law that a person who has engaged in some

22   conduct which is clearly proscribed cannot complain of the vagueness of the law as applied to the

23   conduct of others.  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 445 U.S. 489, 495 (1982).  In

24   *Holder v. Humanitarian Law Project*, the Supreme Court recently reaffirmed that the "rule makes no

25   exception for conduct in the form of speech."  130 S.Ct. 2705, 2719 (2010).  Mathur is barred from

26   brining a facial challenge on Fifth Amendment grounds because the Indictment alleges conduct that is

27   clearly proscribed.  His facial challenge fails because of the general rule that a defendant who engages

28   in conduct that is clearly forbidden by statute cannot complain of the vagueness of a statute as it applies

1  to others' conduct.  Application of this rule precludes Mathur from litigating the constitutional rights of

2  others.  This rule not only protects against "unnecessary pronouncement on constitutional issues," but

3  also against "premature interpretation of statutes in areas where their constitutional application may be

4  cloudy."  *Raines,* 362 U.S. at 21.  Additionally, it ensures that federal courts make informed judgments

5  by limiting their decisions to actual, not hypothetical, cases.  *See Ferber,* 458 U.S. at 768; *see also*

6  *Raines,* 362 U.S. at 22.

7      Finally, the Ninth Circuit has held that the Anti-Kickback Act "gives fair warning of what is

8  prohibited and is not unconstitutionally vague."  *Hanlester,* 51 F.3d at 1398.  The First and Eleventh

9  Circuits have also held that the Anti-Kickback Act is not unconstitutionally vague.  *See United States v.*

10 *Baystate Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 33 (1st Cir. 1989); *United States v.*

11 *Starks,* 157 F.3d 833, 840 (11th Cir. 1998).  At least two other published district court decisions have

12 reached the same conclusion.  *See United States v. Neufeld*, 908 F.Supp. 491 (S.D. Ohio 1995); *United*

13 *States v. Vaghela*, 970 F.Supp. 1018, 1022 (M.D. Fla. 1997).  Mathur has not cited, and the court is not

14 aware of any decision which has held that the Anti-Kickback Act is unconstitutionally vague.

15     **G.    The 2010 PPACA Amendments**

16     Mathur contends PPACA's addition of subsection (h) to the Anti-Kickback Act "has vitiated the

17 specific intent requirement . . . [and] even an inadvertent 'inducement' can now form the basis of a

18 criminal prosecution."  This argument was also raised in a separate Motion to Dismiss (Dkt. #51).  In

19 the court's Report of Finding and Recommendation (Dkt. #112) denying that Motion, the court

20 summarized the split of authority among federal appellate courts about the Anti-Kickback Act's use of

21 the phrase "knowingly and willfully."  It observed that in *Hanlester,* the Ninth Circuit construed the

22 phrase "knowingly and willfully" to require the United States to prove that a defendant: (1) knew that

23 the Anti-Kickback Act prohibited offering or paying remuneration to induce referrals; and (2) engaged

24 in prohibited conduct with the specific intent to disobey the law.  The Ninth Circuit was the only court

25 to conclude that the phrase "knowingly and willfully" in the Anti-Kickback Act required proof that a

26 defendant violated a known legal duty.  The majority view was first articulated by the First Circuit in

27 *United States v. Baystate Ambulance & Hospital Rental Service, Inc*., 874 F.2d 20 (1st Cir. 1989).

28 There, the First Circuit upheld a jury instruction that the term "knowingly" simply means to do

something voluntarily or deliberately and not by mistake or accident.  The First Circuit also approved a

jury instruction which defined the term "willfully" for purposes of the Anti-Kickback Act to mean to do

something purposely with the intent to violate the law, or to do something purposely that the law

forbids.  Other circuit courts of appeal and district courts adopted different formulations, but all had

concluded that the United States is not required to prove that the defendant knew of and intended to

violate the Anti-Kickback Act to be convicted of an offense.  Mathur seems to suggest here that the

PPACA's addition of subsection (h) renders the Anti-Kickback Act unconstitutionally vague because

after the 2010 amendments, the statute is "incomprehensible."

  The court finds that the PPACA's addition of subsection (h) did not eliminate the specific intent

requirement from the Anti-Kickback Act.  The government must still prove a knowing and willful

violation.  Rather, the addition of subsection (h) resolved the split of authority among federal appellate

courts and clarified what "willfully" means for purposes of the Anti-Kickback Act.  The legislative

history of the PPACA supports this finding and underscores Congress' intent in adding subsection (h).

The Congressional Record provides,

> The bill also addresses confusion in the case law over the appropriate
> meaning of 'willful' conduct in health care fraud.  Both the anti-kickback
> statute and the health care fraud statute include the word 'willfully.'  In both
> contexts, *the Ninth Circuit Court of Appeals has read the term to require
> proof that the defendant not only intended to engage in unlawful conduct, but
> also knew of the particular law in question and intended to violate that
> particular law.*  This heightened mental state requirement may be appropriate
> for criminal violations of hyper-technical regulations, but it is inappropriate
> for these crimes, which punish simple fraud. . . . *[The bill] clarifies that
> 'willful conduct' in this context does not require proof that the defendant had
> actual knowledge of the law in question or specific intent to violate that law.*
> As a result, health care fraudsters will not receive special protection they
> don't deserve.

155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of Rep. Kaufman discussing predecessor

bill to PPACA, the Health Care Enforcement Act of 2009) (emphasis added).

  Additionally, in discussing the Senate manager's amendment to H.R. 3590 (later enacted as

PPACA), the Congressional Record provides,

> The manager's amendment also incorporates a vital anti fraud amendment .
> . .derived from the Health Care Fraud Enforcement Act. . . .The provision
> provides for a number of statutory changes to strengthen fraud enforcement.

/ / /

> . . . It also clarifies the intent requirement of another key health care fraud statute in order to facilitate effective, fair, and vigorous enforcement.

155 Cong. Rec. S13692-93 (daily ed. Dec. 21, 2009) (statement of Rep. Leahy).

Thus, the PPACA has not removed a specific intent requirement from the Anti-Kickback Act as Mathur claims. In order to prove a violation of the Anti-Kickback Act, the government must still show that a criminal defendant acted "knowingly and willingly" in offering or paying remunerations in exchange for patient referrals. The PPACA simply clarified that the government is not required to show a criminal defendant specifically knew the Anti-Kickback Act prohibited offering or paying consideration to induce referrals and intended to violate the law.

Counsel have not briefed whether subsection (h)'s amended *scienter* requirement may be applied retroactively. Mathur's Reply (Dkt. #69) to his other Motion to Dismiss (Dkt. #51) argued, for the first time, that the 2010 amended *scienter* requirement does not apply retroactively to conduct which occurred before the effective date of the PPACA, *i.e.*, to the conduct charged in Counts 1-6 of the Indictment. He claims that applying the amended definition of knowingly and willfully to Counts 1-6 would violate the *Ex Post Facto* Clause of the Constitution. The court will not consider arguments raised for the first time in a reply brief with no opportunity for government counsel to respond. The court's order regarding trial required the parties to submit proposed jury instructions and trial memoranda the week before trial. Both sides should, therefore, submit proposed jury instructions and provide the trial court with legal authority supporting their respective positions regarding the *scienter* requirement that applies to all of the counts charged in the Indictment.

**III.    Conclusion**

For all the foregoing reasons,

**IT IS RECOMMENDED** that Mathur's Motion to Dismiss Based Upon Overbreadth and Vagueness and Other Constitutional Principles (Dkt. #48) be DENIED.

Dated this 13th day of September, 2012.

Peggy A. Leen
United States Magistrate Judge

21